# In the United States District Court for the Southern District of Georgia Brunswick Division

| | | |
|---|---|---|
| MYRON MELLS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 213-099 |
| | * | |
| CITY OF DARIEN, a municipal | * | |
| corporation of the State of | * | |
| Georgia; McINTOSH COUNTY, a | * | |
| political subdivision of the | * | |
| State of Georgia; and DAVID | * | |
| KILGORE, in his individual | * | |
| capacity as a Deputy of the | * | |
| McIntosh Sheriff's | * | |
| Department, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court is a fully-briefed Motion for Summary Judgment filed by Defendants City of Darien, McIntosh County, and Deputy David Kilgore ("Deputy Kilgore"). See Dkt. Nos. 67, 76, 80.[1] For the reasons that follow, Defendants' Motion (dkt. no. 67) is **GRANTED** in its entirety.

---

[1] The docket sheet of this case also lists the following as party-Defendants: Hugh Hodge, in his official capacity as Mayor of the City of Darien, Georgia; Deputy Kilgore in his official capacity; and John Does 1-9, individually and in their official capacity as police officers of the City of Darien and deputies of the McIntosh Sheriff's Department. These Defendants were dismissed pursuant to a stipulation of the parties filed on July 22, 2014, see dkt. no. 47, p. 2, and,

In the summer of 2011, a confidential informant notified the City of Darien Police Department that Plaintiff Myron Mells ("Plaintiff") was distributing cocaine from a mobile home in McIntosh County. SUF, ¶ 1.[3] Plaintiff had been charged with drug-related offenses on at least three prior occasions and convicted at least once of possession with intent to distribute illegal substances. Id. at ¶ 2. The confidential informant, who had previously provided the police with reliable information about illegal drugs, purchased cocaine from Plaintiff using funds supplied by the police for that purpose. Id. at ¶ 4. The police then obtained a warrant to search the trailer, which sat on a multi-lot compound owned by Plaintiff's father and maintained by Plaintiff and his two employees. Id. at ¶¶ 5, 13, 15.

---

therefore, the Clerk of Court is **DIRECTED** to update the docket sheet to reflect their termination from this action.

[2] Defendants have filed a Statement of Undisputed Material Facts (dkt. no. 67-2), and Plaintiff has filed a Response (dkt. no. 77) largely agreeing with Defendants' recitation of the facts of this case. Accordingly, the Court, for ease of exposition, cites only to Defendants' version of the facts (dkt. no. 67-2) as the Statement of Undisputed Facts ("SUF") and specifically notes herein any facts with which Plaintiff disagrees. Additionally, Plaintiff has filed a separate Statement of Material Facts That Create Genuine Issues (dkt. no. 76-2), and, to the extent that Defendants' Reply (dkt. no. 80) raises no objection thereto, the Court treats these facts as undisputed and relies upon the same to supplement the SUF as set forth herein.

[3] Plaintiff contests only the materiality, not the truth, of the facts set forth in paragraphs one through four of the SUF. See Dkt. No. 77, ¶¶ 1-4. Accordingly, these facts are included as undisputed here.

On August 10, 2011, the City of Darien Police Department and the McIntosh County Sheriff's Department assembled a joint task force to carry out a no-knock search of Plaintiff's trailer pursuant to the warrant. Id. at ¶¶ 6-7. A joint task force is an arrangement that is common among rural areas of Georgia having relatively few police officers and sheriff's deputies. Id. at ¶ 6; see also Dkt. No. 76-2, ¶ 1. Nevertheless, the police department and sheriff's department in this case had only recently formed the joint task force, SUF, ¶ 6, and, despite the recommendations of their officers, had no standard operating procedures or training programs on the execution of a no-knock search warrant, dkt. no. 76-2, ¶¶ 2-4.

Prior to searching Plaintiff's trailer, Major Danny Lowe ("Major Lowe") met with the officers of the joint task force and briefed them on their assignment. SUF, ¶¶ 7-8. Major Lowe indicated that Plaintiff was a convicted felon who would not be "willing to go down" on more narcotics charges, and that the confidential informant believed that there were weapons in the trailer. Id. According to Deputy Kilgore, this information suggested that Plaintiff could be armed and dangerous. Id. at ¶ 9 (citing Dkt. No. 68-4 ("Kilgore Dep."), 74:14-18). The officers were separated into a three-person perimeter team responsible for securing the exterior of the trailer and a five-person entry team tasked with searching and securing the

AO 72A
(Rev. 8/82)

interior.  Id. at ¶ 10.  The entry team, followed by the
perimeter team and supervisory officers, then drove to
Plaintiff's residence.  Id. at ¶¶ 13-14.

When the officers arrived at the compound, Plaintiff was
working in the yard on a tractor, while his employee was cutting
the grass on a riding lawn mower.  Id. at ¶¶ 15-16.  The entry
team ran through the yard—directly past Plaintiff—to the front
door of the mobile home.  Id. at ¶¶ 17-18.  Deputy Alan
Wainwright ("Deputy Wainwright"), who led the entry team across
the yard, attests that he made eye contact with Plaintiff as he
ran past him and ordered him to get off of the tractor and lie
on the ground.  Id. at ¶ 19 (citing Dkt. No. 68-8 ("Wainwright
Dep."), 46:7-22).  Deputy Kilgore confirms that he heard one of
the other officers shout at Plaintiff to get on the ground.  Id.
at ¶ 18 (citing Kilgore Dep., 61:15-18).  Plaintiff, however,
maintains that no one informed him to take any such action.
Dkt. No. 77, ¶¶ 18-19 (citing Dkt. No. 76-3 ("Pl.'s Decl.")).
Instead, Plaintiff emphasizes that not a single law enforcement
officer approached him, neither to explain that his residence
was being searched nor to instruct him not to enter the trailer
during that time.  Dkt. No. 76-2, ¶ 6 (citing Dkt. No. 68-6
("Pl.'s Dep."), p. 45).

As the entry team reached the door of the trailer, the
perimeter team was coming onto the property.  SUF, ¶ 20.  As

AO 72A
(Rev. 8/82)

Plaintiff watched from his tractor, he saw Officer Anthony Brown ("Officer Brown") use a battering ram to breach the door and then rush inside to secure the trailer with the four other entry team members. Id. at ¶¶ 21-23. Deputy Kilgore believed that the perimeter officers were supposed to ensure that Plaintiff and other persons on the property were secured and unable to disturb the entry team executing the search. Id. at ¶ 20 (citing Kilgore Dep., 34:20-35:14). According to Deputy Kilgore, however, the perimeter team "didn't do [its] job," dkt. no. 76-2, ¶ 6 (quoting Kilgore Dep., 135:15), based on the events that then transpired.

Plaintiff's version of those events proceeds as follows: Plaintiff asserts that while Officer Brown was attempting to breach the door, Plaintiff, hoping to stop him, shouted, "[W]hoa, whoa, whoa, whoa." SUF, ¶ 24 (citing Pl.'s Dep., 46:2-9); see also Dkt. No. 76-2, ¶ 7. The officers did not acknowledge Plaintiff's objections and instead proceeded to breach the door, at which time Plaintiff jumped off of his tractor and began scrambling toward the trailer. SUF, ¶ 25. Plaintiff stumbled while running through the yard but then collected himself, reaching the stairs leading up to the front door of the trailer and climbing them without incident. Id. at ¶¶ 26-27.

AO 72A
(Rev. 8/82)

Plaintiff contends, however, that as soon as he reached the front door, he tripped again—this time falling with his chest to the floor, just inside the doorway.  Id. at ¶ 27 (citing Pl.'s Dep., 50:3-11, and Dkt. No. 68-7, 23:16-19); see also Dkt. No. 76-2, ¶ 8 (citing Pl.'s Dep., pp. 48-52, and Pl.'s Decl.).  Plaintiff's employee who had been working in the yard, Marcus Jones ("Jones"), states that he heard the battering ram hit the door, went to investigate, and, upon rounding the corner of the trailer, saw Plaintiff lying in the doorway.  SUF, ¶¶ 28-29 (citing Dkt. No. 68-3 ("Jones Dep."), 25:10-14).

As Plaintiff's account continues, he then "braced himself with his hands to begin getting up from the floor and immediately heard an officer shout, 'Freeze!  Freeze!'"  Id. at ¶ 30 (citing Pl.'s Dep., 51:22-52:1).  Jones, who could hear what was being said inside the trailer from his position in the yard, heard the officers identify themselves by shouting, "Police!" and "Sheriff's Office!" and order Plaintiff to "get down."  Id. at ¶¶ 29, 31 (citing Jones Dep., 25:10-14, 30:1-2).  An unknown officer then yelled, "He's got a gun!  He's got a gun!" in a voice so loud that anyone inside of the trailer could have heard it and that Jones, in fact, was able to hear it from the yard.  Id. at ¶¶ 32-33 (citing Pl.'s Dep., 52:10, 56:3-12, and Jones Dep., 28:4-9); see also Dkt. No. 76-2, ¶ 9.

AO 72A
(Rev. 8/82)

Plaintiff then explains, "[W]hen I heard him say that, my mind automatic[ally] click[ed], you know, put your hands up. So I was trying to get up off of the floor." SUF, ¶ 34 (quoting Pl.'s Dep., 52:10-12). Despite being ordered to "freeze" and "get down," Plaintiff continued trying to get up from the floor and moving to show his hands. Id. at ¶ 35 (citing Pl.'s Dep., 52:10-12, 53:3-6). Plaintiff then heard a firearm discharge and realized that one of the officers standing behind him had shot him with a single bullet near his right shoulder blade and collarbone. Id. at ¶¶ 36-38.

In his deposition testimony, Plaintiff describes the scene inside of the trailer at the time of the shooting as follows:

Q:  Was your chest touching the floor?

A:  Yes, sir. I was down.

. . . .

Q:  . . . Were you in the process of getting up when you got shot?

A:  Yes, I was trying to brace myself to get up, but I hadn't made it all the way up yet.

Q:  Do you know if you were on all fours or did you have one knee on the ground and one foot on the ground with your hands up off the ground? Do you know exactly what position you were [in]?

A:  I was -- it's kind of hard to say -- explain. I mean, I was trying to get up. I hadn't got [sic] up. I was trying to get up. I mean, I could show you if you want me to. He was like[,] "Freeze, freeze, he['s] got a gun," and when I

AO 72A
(Rev. 8/82)

heard him say that, my mind automatic[ally]
click[ed], you know, put your hands up.

So I was trying to get up off the floor.  I
haven't [sic] even made [it] up off the floor
yet.

. . . .

I wasn't halfway up.  I was trying to get up.
Pl.'s Dep., 50:10-53:4.  Plaintiff states that "everything
happened so fast," to which Jones adds that the officers started
yelling commands "as soon as [Plaintiff] came in the house" and
fired a shot "four or five seconds" later.  SUF, ¶ 39 (quoting
Pl.'s Dep., 69:2, and Jones Dep., 28:13-17).

Notwithstanding Plaintiff's and his witnesses' insistence
upon the foregoing version of events, the officers on the joint
task force tell a very different story.  See Dkt. No. 76-2, ¶
12.  Put succinctly, the officers maintain that "Plaintiff was
shot as he stood in the kitchen of the trailer—eyes fixed on the
back of an officer who was mere feet away—and ignored multiple
commands to stop reaching into a drawer full of knives."  Dkt.
No. 67-1, p. 4; see also Kilgore Dep., 11:20-13:21; Dkt. No. 76-
5 ("Brown Dep."), 32:20-33:6.  Although Deputy Kilgore initially
stated that he shot Plaintiff believing that he was going to
reach into a kitchen drawer, grab a knife, and stab Officer Brad
Marat ("Officer Marat") in the back, he now identifies Officer
Brown as Plaintiff's perceived target.  Kilgore Dep., 13:12-

AO 72A
(Rev. 8/82)

14:17.[4] The officers do not recall anyone ever shouting that Plaintiff had a gun—and even confirm that he was not carrying a gun—though they assert that Plaintiff was, in fact, next to an open drawer full of knives when he was shot. Dkt. No. 67-1, p. 4; see, e.g., Kilgore Dep., 30:15-31:12; Brown Dep., 32:20-33:6, 44:24-45:4.

Plaintiff recounts that immediately after he was shot, he turned around and saw Deputy Kilgore, who had fired the shot, and asked, "Man, why [did] you shot [sic] me?" SUF, ¶ 40. Deputy Kilgore responded, "Man, you had a gun." Id. at ¶ 41. Plaintiff then fell with his chest to the floor, and Deputy Kilgore rolled him over onto his back, patted down his pockets, id. at ¶ 42, and found that he did not have a weapon on him, dkt. no. 76-2, ¶ 11.

Deputy Kilgore then ordered another officer to get something to use to apply pressure to Plaintiff's gunshot wound. SUF, ¶ 42. The officers rendered first aid to Plaintiff and called an ambulance, which took Plaintiff to a hospital to receive treatment and eventual discharge. Id. at ¶¶ 43-44. Other law enforcement officers later completed the search

---

[4] The record reflects that Officer Marat is a short white male, while Officer Brown is a tall black male. See Kilgore Dep., 14:18-15:9. Additionally, Officer Marat's and Officer Brown's descriptions of their respective locations at the time of the shooting suggest that they may not have been in the same area of the trailer as Plaintiff, see dkt. no. 76-4 ("Marat Dep."), 31:9-15; Brown dep., 24:25-25:4, though the evidence also reveals that the trailer is very small, Brown dep., 47:15 ("It was close quarters.").

warrant and discovered firearms, scales, and substances believed to be cocaine and marijuana in Plaintiff's trailer. Id. at ¶ 45.

Plaintiff now seeks to recover damages from the City of Darien, McIntosh County, and Deputy Kilgore in his individual capacity. See Dkt. Nos. 1, 30.[5] In Count I of the Complaint, Plaintiff claims that the Defendants are liable under 42 U.S.C. § 1983 ("Section 1983") for Deputy Kilgore's use of excessive force in violation of Plaintiff's Fourth Amendment and Fourteenth Amendment rights. Dkt. No. 30, ¶¶ 18-26. Plaintiff's Counts II and IV are directed toward only Deputy Kilgore, alleging assault and battery under Georgia state law, id. at ¶¶ 27-29 (Count II), and use of excessive force in violation of Plaintiff's substantive due process rights under the Fourteenth Amendment and Section 1983, id. at ¶¶ 37-41 (Count IV). Count III of the Complaint sets forth Section 1983 claims against the City of Darien and McIntosh County based on their allegedly negligent training, employment, and supervision of Deputy Kilgore and the other officers that executed the search warrant on Plaintiff's residence. Id. at ¶¶ 30-36.

---

[5] Plaintiff initially named fourteen other officers and supervisors as Defendants in this action, including McIntosh County Sheriff Steve Jessup ("Sheriff Jessup"), and named Deputy Kilgore in his official capacity, dkt. no. 1, pp. 3-5, but Plaintiff's claims against those Defendants have since been dismissed by a ruling of the Court on July 17, 2014 (dkt. no. 46), and by the parties' stipulation dated July 22, 2014 (dkt. no. 47).

AO 72A
(Rev. 8/82)

Defendants move for summary judgment on all of Plaintiff's claims, dkt. no. 67, and submit deposition transcripts of Plaintiff, several officers, and Plaintiff's own witnesses in support, dkt. nos. 68-1 to -8. Plaintiff has filed a Response in opposition to Defendants' Motion, dkt. no. 76, attaching his own Declaration made under penalty of perjury and transcripts of the depositions of Officers Marat and Brown, dkt. nos. 76-3 to -5. Defendants have filed a Reply to the Response, dkt. no. 80, and their Motion is now ripe for review.

## LEGAL STANDARDS

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T.

<u>Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u> at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for

the defendants [is] not only proper but required." <u>Morris v.</u>
<u>Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R.
Civ. P. 56(e)).

**DISCUSSION**

## I.   Evidence Considered

Recognizing that Plaintiff's version of the events that
occurred in the trailer differs wildly from their own,
Defendants contend that the Court must consider only Plaintiff's
version in determining whether Defendants are entitled to
summary judgment.  <u>See</u> Dkt. No. 67-1, pp. 2-5.  Additionally,
Defendants argue in their Reply brief that Plaintiff's
Declaration, filed with his Response to their Motion, improperly
attempts to defeat summary judgment by changing the version of
the facts to which Plaintiff has adhered since the inception of
this case.  Dkt. No. 80, pp. 1-2, 4-5 (citing Pl.'s Dep., pp.
50-53, and Pl.'s Decl., ¶¶ 6-7).  Defendants maintain that
Plaintiff's Declaration cannot be reconciled with his clear
prior testimony and, therefore, must be viewed as a sham and
disregarded in evaluating his version of the facts for summary-
judgment purposes.  <u>Id.</u> at pp. 3-6.

### A. The Parties' Conflicting Versions of the Facts

A court, on summary judgment, must view the facts in the
light most favorable to the nonmoving party and draw all
reasonable inferences in that party's favor.  <u>Johnson</u>, 234 F.3d

13

at 507. As a result, where the facts evidenced by the moving party conflict with those of the nonmoving party, the court is "required to credit [the nonmovant's] version of the facts, even if other evidence in the record is more favorable to him." Valderrama v. Rousseau, 780 F.3d 1108, 1115 (11th Cir. 2015) (citing Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005)). In doing so, however, the court's "duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the court[] owe[s] a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." Id. (quoting Evans, 407 F.3d at 1278). In other words, "[w]hen the nonmovant has testified to events," the court does not "pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that [the court] deem[s] most helpful to the nonmovant." Id. (quoting Evans, 407 F.3d at 1278).

In the case at bar, the parties give essentially incompatible versions of what happened during the time period between Plaintiff arriving at the trailer and Deputy Kilgore shooting him in the back. Plaintiff testifies that he tripped and fell in the doorway of the trailer that the officers were searching, officers ordered him to freeze and shouted that he

AO 72A
(Rev. 8/82)

had a gun, and Kilgore shot him when he moved to get up from the floor to put his hands up. SUF, ¶¶ 27, 30, 32, 34-37, 40. By contrast, Deputy Kilgore and the other officers assert that Plaintiff entered the trailer, ignored several commands to stop reaching into a drawer full of knives, and was shot as he stood with his eyes fixed on an officer who was a few feet away. Dkt. No. 67-1, p. 4; see, e.g., Kilgore Dep., 11:20-13:21. Because these accounts are fundamentally different, the Court is obligated, at this stage, to accept Plaintiff's version as true. See Valderrama, 780 F.3d at 1115 (explaining that the police-officer defendant's account of the events underlying the Section 1983 claims could not be considered at summary judgment, even though it could give rise to an issue of material fact, because it conflicted with the plaintiff's own version of the facts).

While perhaps some of the officers' statements regarding this time period would be favorable to Plaintiff, the Court cannot, as Plaintiff urges, see dkt. no. 76-1, pp. 3-4, 8-10, extract these portions of their testimonies to supplement his own. For example, Plaintiff points out that while Deputy Kilgore initially stated that he shot Plaintiff because it appeared that he was going to grab a kitchen knife and stab Officer Marat, Deputy Kilgore now testifies that it was Officer Brown whom he believed Plaintiff would stab. Dkt. No. 76-1, pp. 8-10 (citing Kilgore Dep., pp. 14-18). Even assuming, arguendo,

AO 72A
(Rev. 8/82)

that Deputy Kilgore's self-contradiction would give rise to a genuine credibility issue as Plaintiff contends, see id., Deputy Kilgore's statements would not fit in to Plaintiff's overarching narrative involving his fall and perceived possession of a gun and thus cannot be considered.

As another example, Defendants note that multiple officers maintain that no one ever shouted that Plaintiff was carrying a gun—testimonies that could be more beneficial to Plaintiff than his own. Dkt. No. 67-1, p. 4. Nevertheless, because Plaintiff insists that an officer did, in fact, make this announcement, see SUF, ¶ 32, the Court cannot accept the officers' sworn statements over those of Plaintiff. Even if Deputy Kilgore's and the other officers' statements could somehow be viewed as consistent with Plaintiff's story, the Court could not take them into account because, as Defendants explain, "supplementing one narrative with compatible bits and pieces of a holistically incompatible second narrative strips those transplanted facts of their context, and consequently renders them fundamentally untruthful." Dkt. No. 67-1, pp. 4-5.

Thus, the Court accepts Plaintiff's account of the events in the trailer in full, and declines to factor in any portion of the other witnesses' essentially inconsistent versions, in ruling on the instant Motion.

**B. Plaintiff's Declaration**

A party may use an affidavit or declaration to clarify his deposition testimony and thereby create a genuine dispute as to a material fact. <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 656 (11th Cir. 1984). However, a party "cannot . . . create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony"—in other words, testimony that consists of "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." <u>Id.</u> at 657. In those circumstances, a district court may find that the affidavit or declaration is a sham and cannot be used to defeat summary judgment. <u>Id.</u> at 656; <u>see also Lane v. Celotex Corp.</u>, 782 F.2d 1526, 1533 (11th Cir. 1986) (affidavit or declaration that is "inherently inconsistent" with prior deposition testimony is a sham and must be disregarded).

Contrary to Defendants' assertions, <u>see</u> dkt. no. 80, pp. 3-6, Plaintiff's Declaration serves only to clarify—rather than contradict—his prior deposition testimony. At his deposition, Plaintiff stated that he was lying with his chest to the floor; heard the officer say, "Freeze, freeze, he['s] got a gun"; thought that he needed to put his hands up; and "was trying to brace [himself] to get up" and was in the process of getting up "but . . . hadn't made it all the way up yet" when he got shot. Pl.'s Dep., 50:10–53:4. When asked if he was "on all fours

AO 72A
(Rev. 8/82)

or . . . [had] one knee on the ground and one foot on the ground with [his] hands up off the ground," Plaintiff responded that it was "kind of hard to . . . explain"; he "was trying to get up off the floor" but "hadn't got [sic] up" or "even made [it] up off the floor yet" at the time of the shooting. Id. at 52:2-13. Plaintiff now explains in his Declaration, "I slipped and fell at the door. . . . As I was getting up, I heard he's got a gun. . . . I put my hands up and while I had my hands up, I was shot." See Pl.'s Decl., ¶¶ 5-7.

Plaintiff's Declaration clarifies his prior sworn testimony in several respects. First, Plaintiff represented at his deposition that the officer's statement, "Freeze, freeze, he['s] got a gun" prompted him to believe that he needed to raise his hands and thus to begin getting up from the floor to do so. Pl.'s Dep., 50:10-53:4. Plaintiff's Declaration elucidates the precise sequence and timing of these events in stating that he was getting up from the floor by the time that he heard "he's got a gun." See Pl.'s Decl., ¶ 6. In other words, Plaintiff heard "Freeze, freeze" and immediately began to get up to raise his hands, and then the officer continued his statement with "he's got a gun" while Plaintiff was in the process of getting up. See Pl.'s Dep., 50:10-53:4; Pl.'s Decl., ¶¶ 5-7.

Second, Plaintiff testified that he was then shot while "trying to brace [himself] to get up" and in the process of

18

getting up "but . . . [not] all the way up yet" off of the floor.  Pl.'s Dep., 50:10-53:4.  Plaintiff now adds that he "put [his] hands up and while [he] had [his] hands up . . . was shot."  Pl.'s Decl., ¶ 7.  Taken together, these statements demonstrate that Plaintiff was still in the process of getting up off of the floor—having raised himself up enough to put his hands in the air, though not yet reaching an upright, standing position—at the time of the shooting.  See Pl.'s Dep., 50:10-53:4; Pl.'s Decl., ¶¶ 6-7.

Defendants' attempts to draw inconsistencies between Plaintiff's statements do not persuade the Court otherwise.  See Dkt. No. 80, p. 6.  Defendants emphasize that Plaintiff could not have been both "trying to brace [himself]" (as related at his deposition) and holding his hands in the air (as stated in his Declaration) at the moment that he was shot.  See id. Defendants err in assuming that "bracing" himself to get up implies only that he was preparing to get up, or that he was positioning himself to get up but had to have his hands flat on the floor to do so.  See Merriam-Webster, http://www.merriam-webster.com/dictionary/brace (last visited Jan. 27, 2016) (defining "brace" not only as "to prepare" or "to get ready for something difficult or unpleasant" but also as "to put or plant firmly" or "to make strong, firm, or steady").  In trying to "brace" himself to get up, Plaintiff could mean that he was

AO 72A
(Rev. 8/82)

planting his feet firmly or steadying himself in order to reach an upright position—neither of which would have required that his hands remain on the floor.

Defendants also make much of the fact that Plaintiff, at his deposition, "declined Defendant[s'] offer to agree that he had 'one knee on the ground and one foot on the ground with [his] hands up off the ground'" when he was shot. Dkt. No. 80, p. 6 (second alteration in original) (quoting Pl.'s Dep., 52-53). While perhaps Plaintiff's answer would be in clear conflict with his Declaration had this question concerned only the position of his hands, this was not the case. Rather, Plaintiff was responding to Defendant's description of his overall body position—with one knee and one foot on the ground and both hands in the air—and this response is not necessarily inconsistent with his Declaration. Plaintiff's Declaration details only the position of his hands when he was shot, see Pl.'s decl., ¶¶ 6-7, and thus leaves open the possibility that he had both knees or both feet on the floor when this occurred.

Because Plaintiff's Declaration refines, rather than conflicts with, his prior deposition testimony, Plaintiff may rely on the Declaration to create a genuine factual dispute at this stage. The Court thus will consider Plaintiff's Declaration in ruling on Defendants' summary-judgment Motion.

AO 72A
(Rev. 8/82)

## II.  Section 1983 Claims Against Deputy Kilgore
   (Counts I and IV)

Defendants maintain that summary judgment is proper on Plaintiff's Section 1983 claims against Deputy Kilgore, because Deputy Kilgore's use of force was objectively reasonable.  Dkt. No. 67-1, pp. 12-25.  Even if Deputy Kilgore used excessive force, Defendants argue, he is entitled to qualified immunity on Plaintiff's Section 1983 claims because his conduct did not violate clearly established law.  Id. at pp. 25-27.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007) (quoting Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003)).  A government official who raises qualified immunity as an affirmative defense "must initially establish that he was acting within his discretionary authority."  Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007).  If it is shown that the official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity."  Id. at 1136-37.

For the plaintiff to overcome qualified immunity, he must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing Wilson v. Layne, 526 U.S. 603, 609 (1999)); see also Davis v. Self, 547 F. App'x 927, 933 (11th Cir. 2013) ("Meanwhile, as the Supreme Court recently reiterated, '[q]ualified immunity . . . protects all but the plainly incompetent or those who knowingly violate the law.'" (alterations in original) (quoting Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012))). "If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds." Holloman ex rel. Holloman, 370 F.3d at 1264. A court may decide, in its discretion, which of the two prongs to analyze first. Gilmore v. Hodges, 738 F.3d 266, 272-73 (11th Cir. 2013) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

**A. Discretionary Function**

An officer was acting in the scope of his discretionary authority if he was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265-66 (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994)). This test requires analyzing the

22

"general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. at 1266. For the first prong, "the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." Id. (emphasis omitted).

For the second prong, the Court must determine whether the officer was "executing the job-related function—that is, pursuing his job-related goals—in an authorized manner." Id.

> Each government employee is given only a certain "arsenal" of powers with which to accomplish [his] goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Id. at 1267. Qualified immunity does not protect one who pursues a job-related goal through means "fall[ing] outside the range of discretion that comes with an employee's job." Id.

In the case at bar, it appears relatively undisputed that Deputy Kilgore was acting in a discretionary capacity when the alleged constitutional violations occurred. See Dkt. No. 67-1, p. 28; Dkt. No. 76-1, p. 16. The execution of a search warrant falls squarely within the realm of a police officer's legitimate

23

job-related functions. Moreover, Plaintiff does not contend—and nothing in the record suggests—that Deputy Kilgore used unauthorized means to fulfill this job-related goal. Rather, because it is undisputed that Deputy Kilgore was acting within his duties as a police officer of the McIntosh County Sheriff's Department when the alleged constitutional violations occurred, Deputy Kilgore has sustained his burden of showing that he was acting within the scope of his discretionary authority. The burden thus shifts to Plaintiff to demonstrate that qualified immunity does not protect Deputy Kilgore's conduct while acting in this capacity.

**B. Clearly Established Law**

For the law to be "clearly established" such that a plaintiff can overcome the qualified immunity defense, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (internal quotation marks omitted) (quoting Lassiter v. Ala. A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994)); see also Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ("[The] 'clearly established' standard demands that a bright line be crossed."). Where the existing case law "has not

24

staked out a bright line" showing that a particular course of police conduct is clearly unconstitutional, "qualified immunity almost always protects the defendant," Post, 7 F.3d at 1557 (citing Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989)), unless the plaintiff can show that the defendant's actions were "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official" even without caselaw on point, Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Plaintiff's Response to the instant Motion does not cite any legal precedent that would have put Deputy Kilgore on notice that his split-second decision to fire at Plaintiff was unlawful. See Dkt. No. 76-1, pp. 10-16. Rather, Plaintiff states, "it was certainly well established law that an officer, in a position similar to [Deputy] Kilgore, could not shoot a person in the back with their hands up." Id. at p. 12. However, the facts of this case are much unlike those that the Eleventh Circuit has found to satisfy the "obvious clarity" test. For example, in Oliver v. Fiorino, 586 F.3d 898, 907-08 (11th Cir. 2009), the Court determined that it would have been clear to every reasonable officer that the use of a stun gun was excessive where the plaintiff "was not accused of or suspected of any crime, was not acting belligerently or aggressively, complied with most of the officers' directions, and made no

AO 72A
(Rev. 8/82)

effort to flee." <u>Harper v. Perkins</u>, 459 F. App'x 822, 827 (11th Cir. 2012) (citing <u>Oliver</u>, 586 F.3d at 908).

Here, by contrast, Plaintiff was suspected of possessing and dealing cocaine, SUF, ¶ 4, a significant and often dangerous crime. <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1199 (11th Cir. 2002) (citing <u>Rodriguez v. Farrell</u>, 280 F.3d 1341 (11th Cir. 2002)); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1221 (11th Cir. 1993). Plaintiff was acting erratically during the search—racing toward the trailer, stumbling multiple times, and collapsing inside the doorway. SUF, ¶¶ 25-27; Dkt. No. 76-2, ¶ 8. It is also undisputed that Plaintiff disobeyed orders to freeze while lying in the doorway of the trailer and, instead, chose to keep moving and raise himself up off of the floor. <u>Id.</u> ¶¶ 18-19, 35 (first citing Wainwright Dep., 46:7-22; then citing Kilgore Dep., 61:15-18; and then citing Pl.'s Dep., 52:10-12, 53:3-6). His action—viewed from the perspective of an officer in Deputy Kilgore's shoes—was consistent with an attempt to evade the clear directions of the officers. Further distinguishing this case from <u>Oliver</u> is that here, another officer announced that Plaintiff had a gun on him, <u>id.</u> at ¶ 32, and this weapon would have been easily accessible to him while standing in close proximity to the other officers in the trailer. <u>See</u> <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1269 & n.19 (11th Cir. 2003) (no constitutional violation where the

AO 72A
(Rev. 8/82)

defendant police officer shot the suspect based on another officer's announcement that he was carrying a firearm, even though the suspect was not, in fact, armed (citing McLenagan v. Karnes, 27 F.3d 1002, 1006-07 (4th Cir. 1994))). On these facts, the Court cannot conclude that this is the type of case where the use of force to subdue the plaintiff "was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." See Oliver, 586 F.3d at 908. The Eleventh Circuit's ruling in Harper v. Davis—while decided after the events underlying this case—reinforces this result. 571 F. App'x 906, 913-14 (11th Cir. 2014) ("obvious clarity" test not met where the plaintiff, who was suspected of committing a crime, intended to surrender and raised his empty hands in the air but nevertheless appeared to be fleeing arrest and to have a firearm within his reach).

As Plaintiff fails to demonstrate that any potential constitutional violation in this case was clearly established under existing law, Plaintiff cannot overcome the application of qualified immunity to defeat summary judgment. Deputy Kilgore is thus entitled to judgment in his favor on Plaintiff's Counts I and IV, and this portion of Defendants' Motion is **GRANTED**.


**III. State-Law Claim Against Deputy Kilgore (Count II)**

AO 72A
(Rev. 8/82)

Defendants assert that official immunity protects Deputy Kilgore from Plaintiff's claim for assault and battery in violation of Georgia tort law. Dkt. No. 67-1, pp. 27-31.

The Georgia Constitution enshrines the principal of official immunity, stating that a public official must not be subject to suit for the performance of discretionary functions unless he "act[s] with actual malice or with actual intent to cause injury." Gilbert v. Richardson, 452 S.E.2d 476, 482-83 (Ga. 1994) (quoting Ga. Const. art. I, § 2, para. 9(d)). "Actual malice" denotes "express malice or malice in fact," which require "a deliberate intention to do wrong." Merrow v. Hawkins, 467 S.E.2d 336, 337-38 (Ga. 1996) (quoting Black's Law Dictionary (6th ed. 1990)).

In this way, actual malice is distinct from "malice," which Georgia courts have defined as exhibiting "reckless disregard for the rights of others," as well as the concept of "implied malice" embracing conduct that demonstrates a "reckless disregard for human life." Id. at 338. Nor does mere ill will or "rancorous personal feelings" toward a plaintiff rise to the level of actual malice when paired with a lawful act. Phillips v. Hanse, 637 S.E.2d 11, 13 (Ga. 2006) (citing Merrow, 467 S.E.2d at 337). Further, "actual intent to cause injury" requires intent to cause the harm suffered by the plaintiff and "not merely an intent to do the act purportedly resulting in the

AO 72A
(Rev. 8/82)

claimed injury." <u>Selvy v. Morrison</u>, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008) (quoting <u>Kidd v. Coates</u>, 518 S.E.2d 124, 124 (Ga. 1999)).

Official immunity would protect Deputy Kilgore from liability on Plaintiff's battery claim. Deputy Kilgore's execution of a no-knock search warrant was a discretionary function, as discussed <u>supra</u>, and Plaintiff does not point to any evidence in the record to support his bare assertion that Deputy Kilgore acted with actual malice while performing this function, <u>see</u> dkt. no. 76-1, p. 16. To the contrary, the evidence suggests that Deputy Kilgore did not know Plaintiff before the day of the search, and that he did not communicate or come into contact with Plaintiff at any point during the search prior to firing a single shot at him. See SUF, ¶¶ 7-8, 18-19, 36-41. Deputy Kilgore's actions following the shooting further reflect the absence of actual malice on his part, as he immediately responded to Plaintiff's inquiry regarding his reason for shooting by stating, "Man, you had a gun" and began rendering first aid to him thereafter. <u>See</u> <u>id.</u> at ¶¶ 41-42.

Thus, the undisputed facts do not reflect that Deputy Kilgore even exhibited ill will toward Plaintiff, much less a deliberate intent to wrongfully harm him. As Plaintiff cannot establish this requirement to abrogate official immunity,

AO 72A
(Rev. 8/82)

Plaintiff cannot succeed on his battery claim. Defendants'
Motion is thus **GRANTED** as to Count II.

## IV. Section 1983 Claims Against the City of Darien and McIntosh County (Counts I and III)

Defendants submit that the City of Darien and McIntosh
County are entitled to summary judgment on Plaintiff's Section
1983 claims against them, because Deputy Kilgore did not commit
any violation of Plaintiff's constitutional rights for which
these entities could be held responsible. Dkt. No. 67-1, p. 31.
Even if Deputy Kilgore had engaged in unlawful conduct,
Defendants reason, these claims would nevertheless fail because
Deputy Kilgore is not an employee of either entity. Id. at pp.
31-33. Defendants further argue that even if Deputy Kilgore's
employer were joined as a party to this action, Plaintiff would
be unable to prove supervisory liability to sustain his Section
1983 claims. Id. at pp. 33-39.

In Section 1983 actions, liability must be based on
something more than a theory of respondeat superior. Bryant v.
Jones, 575 F.3d 1281, 1299 (11th Cir. 2009); Braddy v. Fla.
Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998).
A supervisor may be liable only "when the supervisor personally
participates in the alleged constitutional violation or when
there is a causal connection between the actions of the
supervising official and the alleged constitutional

30

deprivation." <u>Braddy</u>, 133 F.3d at 802 (quoting <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990)).

Significantly, the Supreme Court of Georgia has determined that "[t]he sheriff is an elected constitutional county officer and not an employee of the county commission." <u>Brown v. Dorsey</u>, 625 S.E.2d 16, 21 (Ga. Ct. App. 2005) (quoting <u>Bd. of Comm'rs of Dougherty Cty. v. Saba</u>, 598 S.E.2d 437 (Ga. 2004)). In other words, "the [Georgia] Constitution has made the sheriff independent from the [c]ounty, notwithstanding the designation of the sheriff as a 'county officer.'" <u>Id.</u> "In addition, deputy sheriffs are deemed employees of the sheriff, not the county, and the county cannot be held vicariously liable for the negligence of the sheriff's deputies." <u>Id.</u> (citing <u>Lowe v. Jones Cty.</u>, 499 S.E.2d 348 (Ga. Ct. App. 1998)).

Even assuming, <u>arguendo</u>, that Plaintiff could prove that Deputy Kilgore violated his constitutional rights, Plaintiff cannot sustain claims against the City of Darien or McIntosh County on the basis of such violation because he fails to establish that these Defendants are supervisors of Deputy Kilgore. The record reflects that Deputy Kilgore is a Deputy of the McIntosh County Sheriff's Department and, as such, is an employee of Sheriff Jessup, dkt. no. 1, pp. 3-4. <u>See Brown</u>, 625 S.E.2d at 21. Because neither Deputy Kilgore nor Sheriff Jessup

AO 72A
(Rev. 8/82)

is an employee of McIntosh County, this entity cannot be liable for their actions under a theory of respondeat superior.

Nor is there any employment relationship between these officers and the City of Darien. At most, Plaintiff shows that the McIntosh County Sheriff's Department put together a joint task force with the City of Darien Police Department, and that Deputy Kilgore served on this joint task force. SUF, ¶¶ 6-7, 9. However, Plaintiff does not show that Deputy Kilgore's participation on the joint task force somehow made him an employee of the City of Darien Police Department. Nor does Plaintiff allege, let alone establish, that any officer of the City of Darien Police Department engaged in conduct that violated Plaintiff's constitutional rights.

Accordingly, Plaintiff fails to set forth any basis upon which a reasonable jury could hold the City of Darien and McIntosh County liable for Deputy Kilgore's actions under Section 1983. Summary judgment in favor of these Defendants on Counts I and III is, therefore, appropriate. This portion of Defendants' Motion is **GRANTED.**

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (dkt. no. 67) is **GRANTED,** and Defendants are entitled to judgment in their favor on all claims. The Clerk of Court is

AO 72A
(Rev. 8/82)

**DIRECTED** to enter the appropriate judgment and to close this case.

    **SO ORDERED**, this 12TH day of February, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)